UNITED STATES DISTRICT COURT
SOUTHERN DISTRIST OF FLORIDA

CASE NO.:  06-60146-CIV-TORRES

CHRISTOPHER PEER,

     Plaintiff/Counter-Defendant,

vs.


DANIEL WARFIELD LEWIS,

     Defendant/Counter-Plaintiff.

_____/

**RICHARD L. ROSENBAUM, ESQ. AND
LAW OFFICES OF RICHARD L. ROSENBAUM ESQ.'S
RESPONSE IN OPPOSITION TO DEFENDANT
DANIEL WARFIELD LEWIS' MOTION FOR SANCTIONS**

COMES NOW Richard L. Rosenbaum, Esq. and the Law Offices of

Richard Rosenbaum, Esq. (hereinafter collectively referred to as "Rosenbaum" or

"Former Counsel for the Plaintiff"), and respectfully responds in opposition to

Defendant, Daniel Warfield Lewis' Motion for Sanctions against Plaintiff's Former

Counsel,  Richard L. Rosenbaum, Esq. and the Law Offices of Richard

Rosenbaum, Esq., pursuant to Title 28 U.S.C. § 1927, and the court's inherent

powers (DE 151) and the accompanying Memorandum of Law (DE 153) and

states as follows:

### A. The Facts Missing from Lewis' Motion for Sanctions

The following events set forth the correct factual progression of this case

and Rosenbaum's participation in the litigation as Peer's initial counsel.

1.   On January 17, 2006, Daniel Warfield Lewis' filed an Emergency

Complaint  for Declaratory Judgment Concerning Candidate Ineligibility,

attacking Peer's compliance with the City of Fort Lauderdale residency

requirement.  A copy is attached as Exhibit A and incorporated herein

*verbatim.*  Specifically, in paragraph 19 the Emergency Complaint stated: [1]

**"What is more, *an October 15, 2005, credit report by TransUnion, one**

**of the three major credit bureaus, reported* that the Defendant's**

**current address is '18 Charter Drive, Wilmington, North Carolina**

**28403.'"[2]** [Emphasis added.]

2.   On January 31, 2006, Richard L. Rosenbaum, Esquire, of the Law Offices

of Richard L. Rosenbaum, Esquire, filed a limited Notice of Appearance on

behalf  of Christopher Peer (hereinafter referred to as "Peer") in the state

court proceedings wherein Lewis sought to remove Peer as a mayoral

candidate in the City of Fort Lauderdale 2006 elections.  *Lewis v. Peer*,

Broward County case number 06-599(21) [Burnstein].

---

[1] In Defendant Lewis' Motion for Sanctions, he omits a crucial portion of the allegation set forth in Lewis' Emergency Complaint.  His specific representation that his knowledge of Peer's residence stemmed from a TransUnion Credit Report, was part of the good faith basis for filing of the Federal Complaint. Further, Lewis used the stellar reputation of TransUnion, "one of the three (3) major credit bureaus" to lend legitimacy to Lewis' claims that he had obtained Peer's confidential credit information.

[2] Nowhere in Lewis' Motion does he quote the entire sentence contained in Paragraph 19 of his "Emergency Complaint."  Instead, he attempts to mislead the court into believing that the issue of whether Lewis actually obtained Peer's credit report was dispositive of the suit. It is not.

3.     Rosenbaum filed a Motion to Dismiss Lewis' Emergency Complaint Based Upon The Plaintiff's Failure to Properly Effectuate Service of Process. The Motion was granted after a hearing conducted on February 1, 2006.

4.     Following a hotly contested State court hearing, Rosenbaum, Lewis' State counsel, Robert Malove, and Malove's law clerk had a heated discussion in the hallway of the courthouse.  There were several witnesses.  Malove's law clerk was a part of the conversation and stated that the information in paragraph 19 was obtained from LEXIS/NEXIS or Westlaw.  At the time neither Peer nor Rosenbaum were advised by anyone of "Westlaw People Finder Historic Tracker Record" as the purported source of information Peer's credit  report was obtained from.

5.     Based upon Lewis' representation in paragraph 19 of his Emergency Complaint and Lewis' statements to various members of the media, Rosenbaum thereafter drafted a Federal Complaint predicated upon a violation of the Fair Credit Reporting Act, contained in Title 15, U.S.C. Section 1681, *et. seq.,* hereinafter referred to as the "FCRA."

6.     Lewis has sought Rule 11 sanctions against each of the lawyers who succeeded  Rosenbaum in representing Peer as well as Peer himself.  On October 10, 2006, Defendant Lewis filed a Rule 11 Sanction Motion against Roderman and Greenbaum (DE 118); Roderman responded in opposition (DE 121);[3] Greenbaum similarly filed a Response in Opposition

---

[3]Roderman and Greenbaum's counsel's arguments in opposition to Lewis' Motion for Sanctions are respectively adopted as if set forth more fully herein *verbatim* (DE 121; 126).

(DE 126).  Peer has not yet responded individually, and appears to be proceeding *pro se* at this juncture.  The sanction matters are pending before this Honorable Court.

7. Neither Rosenbaum nor Peer (while Rosenbaum was his counsel) ever received any pleading, notice, or correspondence that retracted the factual representation concerning information alleged to be contained on Peer's TransUnion credit report  in paragraph 19 of the Emergency Complaint.

8. Subsequently, Robert Malove filed an Amended Emergency Complaint in state court in another attempt to remove Peer from the mayoral ballot. Rather than correcting the information in paragraph 19 and/or explaining how the TransUnion credit information was obtained, Lewis simply deleted the entire paragraph from the Emergency Complaint.

9. On February 7, 2006 after Daniel Lewis amended his Emergency Complaint and deleted any reference to the source of the address he obtained from Peer's credit report, a hearing was conducted in State court on Peer's Motion to Dismiss for Failure to Join An Indispensable Party, (the Supervisor of Elections), and Peer's Motion to Dismiss or, Alternatively, Motion to Abate Proceedings.  Peer's Motion to Dismiss was granted and Lewis' Emergency Complaint and Amended Complaint were again dismissed.  No further action occurred in the State "election case."

10. In early February 2007, a process server was employed by Richard L. Rosenbaum and Peer to effectuate service of process of the instant FCRA Complaint upon Defendant Lewis.

11.    Defendant Lewis claims that the service of process in this case as warranting sanctions.  He is, simply put:  grossly incorrect.  To the contrary, when the process server went to Daniel Lewis' residence to serve him on February 3, 2006, substitute service was effectuated on an individual residing in the Lewis home who represented herself to reside on the premises and to be of proper age (DE 3).

12.    In anticipation of Daniel Lewis' attempts to quash service, in an abundance of caution, the process server[4] subsequently obtained actual personal service on Defendant Lewis (DE 6).  Both Returns of Service were filed with the court (D.E. 3 and 6).

13.    Defendant Lewis never contested service of process of the Federal complaint.  Apparently, he and his counsel either acknowledged that substitute service was effectuated or agreed that subsequent personal service satisfied the  law and properly effectuated service.

14.    On February 14, 2006, the Fort Lauderdale mayoral election was conducted as scheduled.  Incumbent Mayor Jim Naugle received 6,622 votes; Dan Lewis received less than half, 3,173 votes; and Christopher James Peer received 473 votes.  *See* Broward County Supervisor of Elections website at http://www.browardsoe.org/ERSummary.aspx?eid=3.

_____

[4] The process server in this case was a licensed private investigator who was not a certified Elisor to effectuate valid service of State Court Summons.  While an Elisor is permitted to effectuate service of process of summons in State court, one need not be an Elisor to serve a Summons and Complaint or service a Subpoena Deposition or other process of the Federal court.  Any individual over the age of 21 years of age, who is not an interested party, may effectuate service of process in Federal Court.

15.    On the same date as the election, Richard L. Rosenbaum had abdominal
surgery and as a result of complications, was hospitalized into the
following month in a local hospital in Broward County as a result of
gastrointestinal complications.

16.    Rosenbaum and Peer relied upon Robert Malove, Esquire, who was
Lewis' attorney in the State court filing, and Lewis' own representation in
the initial Emergency Complaint that the credit information had, in fact,
been obtained from TransUnion, as well as Lewis' comments to the media
that he obtained the "TransUnion information."  *See* Article attached as
Exhibit B.

17.    A review of Peer's credit reports left open and completely intact the
reasonable and *bona fide* belief that, as expressly represented by Lewis
in his Emergency Complaint, and pursuant to subsequent statements
made by Lewis to the media, credit information (Peer's prior residence),
had been obtained from TransUnion and published by Lewis in his
Emergency Complaint in an attempt to win an election by keeping a
qualified colleague off the ballot.

18.    Based upon Malove and Lewis' representations in the Emergency
Complaint before the Circuit Court of the Seventeenth Judicial Circuit,
made in open court which carried the authority of a verified pleading, Peer
and Rosenbaum reasonably believed that Lewis or an agent on his behalf
had nefariously obtained access to Peer's credit information.  *See* Rule
1.030, Fla. R. Civ. P.  This was bolstered by statements Lewis made to the

media resulting in a February 2, 2006 article which appeared in the Sun Sentinel.  It was reported that "Lewis said he had never seen the credit report and was told about it by someone he refused to identify."[5]

19.    Contrary to Defendant Lewis' assertions, the credit report itself did not dispel Malove and Lewis' representation in the Emergency Complaint. Certainly, there was evidence which was considered by initial counsel and Peer that the report did not show "obtained by Dan Lewis" in the place indicating lawful requests for information.  However, the credit report itself was not dispositive of the issue, especially in light of Lewis' direct factual assertion in paragraph 19 of the Emergency Complaint combined with the ease in obtaining third party credit information via the Internet or through the use of a computer.  Plus, Peer's credit report had recently been obtained by Direct TV in a time period when Lewis admitted it had been obtained from TransUnion, and it is <u>not</u> uncommon for private investigators or others to get access to such reports from third parties who have lawfully or unlawfully obtained the credit information.

20.    Further, Lewis' comments to the media, refusing to identify "who slipped him the information," verified legitimate concerns as to Lewis' violation of the FCRA.

21.    Richard L. Rosenbaum remained hospitalized from February 14, 2006 through March 7, 2006.

---

[5] Interestingly, if Peer, Lewis, Malove, and Rosenbaum had the conversation which has been alleged in Lewis and Malove's Affidavits in this case, why would Lewis refuse to disclose the source of the credit information conveyed to him?

22.　　While it is true that not a great deal of pretrial preparation was completed in March and April 2006, Rosenbaum was in the midst of multiple abdominal surgeries and removal of organs, and was unable to work on a full time basis.  However, no deadlines were missed by the Plaintiff and any alleged "delay" complained of by defense counsel is untrue or manufactured.

23.　　In May, Rosenbaum initiated some initial discovery via a Request for Admissions and filed an Offer of Compliance with Mandatory Disclosure imposed by this Honorable Court.

24.　　Peer knew as early as June 1, 2006, that based upon Rosenbaum's medical condition , Rosenbaum intended to withdraw as counsel.

25.　　On June 13, 2006, attorney O'Loughlin first entered her Notice of Appearance.  Six (6) days later, Rosenbaum filed his Motion to Withdraw, which was granted two (2) days later.

26.　　Before Richard L. Rosenbaum withdrew, opposing counsel sent a letter suggesting two (2) weeks in June in which counsel desired to depose Peer and Rosenbaum.  Rosenbaum objected to his deposition being taken as he was counsel, not a witness in these proceedings.[6]  Further, Peer was living and working full time in Ocala, Florida by that time and advised that he could not be in South Florida during the two (2) week period suggested by Lewis' counsel during the times Rosenbaum was also

---

[6] Rosenbaum has no knowledge of the allegations that Defendant Lewis was threatened by Mayor Naugle or what actions Peer took in his quest to become Mayor of Fort Lauderdale.  Rosenbaum acted only as counsel in the campaign proceedings and filed thereafter a *bona fide* claim for violation of the FCRA.

available.  Rosenbaum was still undergoing abdominal procedures and was waiting to coordinate appointments with doctors at Mayo Clinic in Rochester, Minnesota.

27.   **A Good Faith Basis Exists for Peer's FCRA Claim**:  Despite Lewis' protestations to the contrary in paragraphs 20-54 of this Motion, a good faith factual basis existed for Peer's FCRA claim.  There were *bona fide* facts at issue and based upon the Court's resolution of the facts and application of the law, Rosenbaum, as well as successor counsel, Roderman and Greenbaum all believed Peer lodged a meritorious claim. None of successor counsel ever acknowledged Lewis' conspiracy claim that Naugle, Rosenbaum, Malkus, and/or Peer were involved in a conspiracy to assist Mayor Naugle in the 2006 election.

28.   Defendant, Lewis, complains in ¶ 74-75 of the Motion for Sanctions that Rosenbaum "only" filed a Request for Admissions and did not seek to depose Lewis before moving to withdraw.  At that juncture, the discovery cut off was still a sufficient time in the future.  There was ample time to conduct discovery.

29.   Prior to moving to withdraw from representing Peer, Rosenbaum spoke telephonically with opposing counsel (O'Loughlin) and advised that he was at Mayo Clinic in Rochester, Minnesota undergoing various procedures and would be moving to withdraw from this case.

30.   While at Mayo Clinic, Rosenbaum asked a colleague, Stephen Zukoff, Esquire, to contact O'Loughlin and to file a Motion to Withdraw on

Rosenbaum's behalf.  Defendant Lewis makes much ado over the fact that in moving to withdraw, Rosenbaum asked for 45 days for Peer to obtain new counsel and proceed.  He fails to mention that the Motion to Withdraw was granted in part and denied in part.  Rosenbaum was permitted to withdraw but Peer was <u>not</u> given the 45 days requested to obtain new counsel and respond to outstanding discovery requests.  Peer nevertheless obtained subsequent counsel on two (2) separate occasions.  Upon information and belief, each lawyer involved followed what Rosenbaum had put forth, believing also that they were acting in good faith in pursuing Peer's claim.

31.   Rosenbaum believed at the time that the order was entered allowing his withdrawal applied to the instant case <u>and</u> the countersuit.  Later, in an abundance of caution, and based upon confusion with regards to counsel and *pro se* parties, Richard L. Rosenbaum again moved to formally withdraw from the countersuit, and the same was granted.

32.   A few weeks after entry of the Order granting the Motion to Withdraw as counsel, O'Loughlin contacted Rosenbaum in an attempt to resolve the litigation via a Motion for Rule 11 Sanctions.  Rosenbaum informed opposing counsel that he had been relieved of all responsibilities with regard to the case and no longer represented Peer.  Rosenbaum could not bind Peer.  Peer was in the process of obtaining new counsel.  Rosenbaum was not in a position to seek "safe harbor" even if that was the proper course: which it was not.  The case proceeded to be

prosecuted by Barry Roderman's office and subsequently by Scott Greenbaum, Esquire.

33. Rosenbaum heard nothing further until approximately one (1) year later when Defendant Lewis personally appeared in his reception area and dropped off the Motion and Memorandum.[7]

34. Following Rosenbaum's representation of Peer, other attorneys believed that Peer's claim was meritorious and filed in good faith. The Law Offices of Barry Roderman entered its Notice of Appearance on behalf of Christopher Peer. Barry G. Roderman likewise filed his Notice of Appearance on July 20, 2006 (DE 25). Scott M. Greenbaum filed his appearance the following day. Heather Anders, Esq.'s Notice of Appearance was filed on August 16, 2006 (DE 53). Each attorney opined as to the *bona fides* of the FCRA Complaint and proceeded to prosecute Peer's claim and defend Lewis' countersuit.

35. An analysis of subsequent proceedings indicates that Lewis has filed similar Motions for Sanctions against successor counsel based on the same basic theory: that no good faith basis existed for Peer's federal suit. To the contrary,[8] if Defendant Lewis obtained what he represented in his

---

[7] Interestingly, Lewis contests aspects of service, yet despite his position as an interested party, wanted to personally serve   Richard L. Rosenbaum in his reception area in front of clients and colleagues.

[8] Unfortunately, Peer's pleadings have been stricken and his case has "fallen apart" as a result of Greenbaum's alleged failure to respond to court orders; failure to respond to Peer's calls and emails; and his failure to pursue Christopher Peer's claim or prepare a defense to Defendant, Lewis' baseless lawsuit claiming a conspiracy between Mayor Naugle, Rosenbaum, Peer, and Malkus to ensure Daniel Lewis did not defeat the incumbent, Mayor Naugle. The

State court pleading, he violated the FCRA.  Among other remedies, Peer sought the statutory amount of $1000 plus reasonable attorney fees and costs.

36.   From the outset, Plaintiff Peer believed that his claims of a Fair Credit Reporting Act violation contrary to Title 15 U.S.C.§ 1681 were simple. Relying on Defendant Lewis' representations in his state court Emergency Complaint, and his subsequent quotes and comments in the media, Peer had a good faith basis to believe that the FCRA had been violated and that Peer was the victim.  Further, the violation was for political purposes, which Peer and Rosenbaum believed could be the basis under the correct circumstances for an award of punitive damages.

**A.    No Sanctions Are Warranted Against Rosenbaum**

Despite Lewis' protestations to the contrary, Rosenbaum violated no rule of procedure or ethical cannon by representing his client, Christopher Peer in a simple FCRA suit.  As a result of the following reasons, Lewis' Motion should be denied.

Despite Defendant Lewis' contentions, Rosenbaum did not engage in conduct which "multiplied the proceedings" or was "unreasonable and vexatious." Clearly and importantly, the power of the court to impose excess costs personally on attorneys should be exercised <u>only in instances of serious and studied disregard for orderly processes of justice</u> [emphasis added].  *Kiefel v Las Vegas*

---

Mayor has not been the subject of discovery by Lewis, and Rosenbaum has never discussed this case with Naugle.  Simply put:  no conspiracy ever existed, no proof of a conspiracy was ever put forward, and the same is only imagined by Lewis.

*Hacienda, Inc. 404 F2d 1163 ( 7th Cir. 1968 ),* cert. denied  395 U.S. 908, 23

L.Ed.2d 221, 89 S.Ct. 1750, *rehearing denied*, 395 U.S. 987, 23 L.Ed.2d, 89

S.Ct. 2128, [*imposition of sanctions*, under Title 28 U.S.C. Section 1987, is highly

unusual and requires a clear showing of bad faith.]  *West Virginia v. Chas Pfizer*

*& Co.,* 440 F.2d 1079 (2d Cir. 1971), *cert. denied,* 404 U.S. 871, 30 L.Ed.2d 115,

95 S.Ct. 81 (1971).  There <u>must</u> be a finding of willful bad faith on the part of the

offending attorney before attorneys' fees and costs may be taxed under Title 28

U.S.C. Section 1927.  *Baker Industries, Inc. v. Cerberus Ltd.,*  764 F.2d 204 (3d

Cir. 1985).

   Defendant Lewis has sought sanctions against Rosenbaum pursuant to

"Title 28 U.S.C. Section 1927" and "the court's inherent power."  Before the court

may assess fees under Title 28 U.S.C. Section 1927, an attorney must

intentionally file or prosecute a claim that lacks plausible legal or factual basis.

*Indianapolis Colts v. Baltimore*, 775 F.2d 177 (7th Cir. 1985).  The statute is

inapplicable in absence of evidence of bad faith.  *Hilmon Co. v. Hyatt Int'l., S.A.*

138 F.R.D. 66, 20 F.R. Serv. 3d 1022 (1991 D.C. VI).

   *Sub judice*, based upon Lewis' specific language in paragraph 19 of his

Emergency Complaint and his subsequent quotes in the media, Rosenbaum and

Peer believed, in good faith, that a Fair Credit Reporting Act violation had

occurred.  Accordingly, Peer filed the instant Federal complaint, and while

Rosenbaum was counsel of Record, the Plaintiff was in compliance with all court

orders and was in the process of moving the case towards trial.  Both

Rosenbaum and Peer believed Peer had a good faith claim, and Rosenbaum was retained to pursue the action on Peer's behalf.

In an analogous case, *Jerolds v. City of Orlando,* 194 F.Supp. 2d 1305 (M.D. Fla. 2001), the court held that although firefighters' counsel continued to pursue civil rights claims against city even though claims lacked merit, there was no evidence of bad faith on part of counsel that would subject them to attorney's fees under the statute. In this case, there has never been any showing that Peer's claim lacked merit. The claim was not the subject of a Motion to Dismiss or a Motion for Summary Judgment on the merits.

In a recent case concerning sanctions under Title 28 U.S.C. Section 1927, in *Amlong & Amlong v. Denny's Inc,* ___ F.3d ___ (11th Cir. 2007) [11[th] Cir. No. 04-14499); and *Amlong & Amlong v. Denny's Inc.*, 457 F.3f 1180 (11th Cir. 2006), the court stated:

> As a panel of this Court observed in *Peterson v. BMI Refractories*, 124 F.3d 1386 (11th Cir. 1997). The plain language of the statute imposes three essential requirements for an award of sanctions under Section 1927: First, the attorney must engage in 'unreasonable and vexatious' conduct. Second, that 'unreasonable and vexatious" conduct must be conduct that "multiplies the proceedings.' Finally, the dollar amount of the sanction must bear a financial nexus to the excess proceedings, i.e., the sanction may not exceed the 'costs, expenses, and attorneys' fees reasonably incurred because of such conduct.'

> *Id.* at 1396.

The Eleventh Circuit further stated:

> We have consistently held that an attorney multiplies proceedings 'unreasonably and vexatiously' within the meaning of the statute only when the attorney's conduct is so egregious that it is 'tantamount to bad faith.' *Avirgan v. Hull,* 932 F.2d 1572, 1582 (11th Cir. 1991), *see also Schwartz v. Millon Air, Inc.,* 341 F.3d 1220, 1225 (11th Cir. 2003)(bad faith is the touchstone).

*Id.* at 1190 (ck pg #).

As set forth in case law interpreting Section 1927, it is clear that negligent conduct, standing alone, will not support a finding of bad faith under Section 1927.  An attorney's conduct will not warrant sanctions if it simply fails to meet the standard of conduct expected from a reasonable attorney.   In fact, in order to craft sanctions against Rosenbaum,  Lewis and counsel would have to show that it was bad faith on Rosenbaum to believe the very people who seek sanctions predicated upon their own previous statements.

Thus, in *Schwartz,* the Eleventh Circuit wrote:

> Section 1927 'is not a catch-all' provision for sanctioning objectionable conduct by counsel. . . . For sanctions under Section 1927 to be appropriate, something more than a lack of merit is required. The statute was designed to sanction attorneys who 'willfully abuse the judicial process by conduct tantamount to bad faith.'  'Bad faith' is the touchstone.  Section 1927 is not about mere negligence. A determination of bad faith is warranted where an attorney knowingly or recklessly pursues a frivolous claim or engages in litigation tactics that needlessly obstruct the litigation of non-frivolous claims.

*Schwartz,* 341 F.3d at 1225.

Thus, an attorney's conduct must be particularly egregious to warrant the imposition of sanctions -- the attorney must knowingly or recklessly pursue a frivolous claim or needlessly obstruct the litigation of a non-frivolous claim.  If the attorney's misconduct meets this <u>high standard</u>, the district court may order the attorney to pay the "costs, expenses, and attorneys' fees reasonably incurred" because of the attorney's misconduct -- that is, the excess costs that the attorney's multiplication of proceedings has added to the cost of the litigation.

*See*  Title 28 U.S.C. 1927; *Peterson v. BMI Refractories,* 124 F.3d 1386, 1396 (11th Cir. 1997)(explaining that sanctions under Section 1927 "must bear a financial nexus to the excess proceedings").  No sanctions are warranted at bar.

Interestingly, Lewis' Motion was not filed "as soon as practicable," despite the fact that a motion for sanctions should be filed as soon as practicable after discovery of a sanctionable violation.  *Northlake Mktg. & Supply, Inc. v. Glaverbel, S.A.* 194 F.R.D. 633, 48 F.R. Serv. 3d 1186 (2000 N.D. Ill.).  Here, Defendant Lewis claims Rosenbaum should be sanctioned for filing a baseless lawsuit.  While the merits are being  contested, what is clear is that Lewis waited until Rosenbaum had withdrawn from Peer's case for approximately a year before filing his  frivolous Motion for Sanctions.

The "central purpose of Rule 11 is to deter baseless filings in district court and thus . . . streamline the administration and procedure of the federal courts." <u>Cooter & Gell v. Hartmarx Corp.</u>, 496 U.S. 384, 393, 110 S.Ct. 2447, 110 L.Ed.2d 359 (1990).  Since the 1993 amendments, the language of Rule 11 indicates that the imposition of sanctions is left to the sound discretion of the district court judge. *See* <u>Rafferty v. Nynex Corp.</u>, 314 U.S. App. D.C. 1, 60 F.3d 844, 852 <u>(D.C. Cir. 1995)</u>; Fed.R.Civ.P. 11(c)(noting that when the rule has been violated, a court *may* impose an appropriate sanction); *see also* 5A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1336 (2d Ed. Supp. 2000) (commenting that the scope of the Advisory Committee's list of factors to consider when deciding whether or not to impose a sanction suggests that "the district court is given the widest possible latitude under the new" version of Rule

11).  As possible sanctions pursuant to Rule 11, the court has an arsenal of options at its disposal, "such as striking the offending paper;[9] issuing an admonition, reprimand, or censure; requiring participation in seminars or other educational programs; ordering a fine payable to the court; [or] referring the matter to disciplinary authorities." *See* Fed.R.Civ.P 11 advisory committee's note (1993).

> **B.**  **Rosenbaum did not violate Rule 11, Fed. R. Civ. P. and his actions of counsel filing a "simple" FCRA complaint did not violate Title 28 U.S.C. Section 1927 Or Warrant Sanctions Under The Court's Inherent Power.**

The purpose of Section 1927 is to allow the Court "to assess attorney's fees against an attorney who frustrates the progress of judicial proceedings." *United States v. Wallace*, 296 U.S. App. D.C. 93, 964 F.2d 1214, 1218 (D.C. Cir. 1992).  Before imposing sanctions on an attorney, the court must evaluate whether the attorney's conduct was *"at least* reckless." *Id.* at 1217.  "Unintended, inadvertent, and negligent acts, however will not support an imposition of sanctions under Section 1927." *Id.* at 1219 (*quoting Cruz v. Savage*, 896 F.2d 626, 631 (1st Cir. 1990)).  Rosenbaum did nothing of the sort:  he simply zealously represented an individual who ran for mayor based upon an express representation  made in an Emergency pleading filed with the court, confirmed by Lewis' subsequent statements to the media and lack of recantation of the violations.

---

[99] Which has already been done here, but not because the suit was "offending," only because Peer was not properly represented by subsequent counsel and his affirmative claims were stricken as a result of Greenbaum's malfeasance and/or non-compliance with court orders.

For an action to be considered "reckless misconduct," there must be a "conscious choice of a course of action, either with knowledge of the serious danger to others involved in it or with knowledge of facts which would disclose this danger to any reasonable man." *Id.* at 1220 (*quoting* Restatement (Second) of Torts § 500 Cmt. G. (1964)).  A showing by the moving party that the counsel in question acted recklessly or deliberately "in the face of a known risk" is required. *Healey v. Labgold*, 231 F. Supp. 2d 64, 68 (D.D.C. 2002) (*citing Wallace*, 964 F.2d at 1219).

### C.     Title 28 U.S.C. Section 1927 Must Be Strictly Construed, Thus Prohibiting An Award Of Sanctions Against Richard L. Rosenbaum or the Law Firm of Richard L. Rosenbaum

A variety of courts have noted that "the power to assess costs against an attorney under § 1927 . . . is a power that must <u>strictly be construed and utilized only in instances evidencing a serious and standard disregard for the orderly process of justice</u>.'" *Dreiling v. Peugeot Motors of Am., Inc.*, 768 F.2d 1159, 1165 (10th Cir. 1985) (*quoting Keitel v. Las Vegas Hacienda, Inc.*, 404 F.2d 1163, 1167 (7th Cir. 1968)[Emphasis added] *and citing United States v. Ross*, 535 F.2d 346, 349 (6th Cir. 1976)).

### D.     The Court Should Not Exercise Its Inherent Powers Under The Facts And Circumstances Of This Case.

When the Federal Rules of Civil Procedure do not provide courts with sufficient authority to protect the integrity of the judicial system and prevent abuses of the judicial process, courts have the inherent power to impose sanctions for abusive litigation practices undertaken in bad faith. *See Shepherd*, 62 F.3d at 1472; *Young v. Office of the U.S. Senate Sergeant at Arms*, 217

F.R.D. 61, 65 (D.D.C. 2003). "These powers are governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases.'" *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991) (*quoting Link v. Wabash R.R. Co.*, 370 U.S. 626, 630-31, 82 S.Ct. 1386, 8 L.Ed.2d 734 (1962)). However, "because of their very potency, inherent powers must be exercised with restraint and discretion." *Id.* at 44, 111 S.Ct. 2123 (*citing Roadway Express, Inc. v. Piper*, 447 U.S. 752, 764, 100 S.Ct. 2455, 65 L.Ed.2d 488 (1980)).

    As set forth in *Cordoba v. Dillard's, Inc.,* 419 F.3d 1169 ( 11th Cir. 2005), s*ee generally Chambers v. NASCO, Inc., 501 U.S. 32, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991)(*holding that district courts retain the "inherent power" to impose sanctions, including attorney's fees, where a litigant has engaged in bad-faith conduct). In *Byrne v. Nezhat*, 261 F.3d 1075 (11th Cir. 2001), we stated that a court must be 'cautious in exerting its inherent power and that, '*because the court's inherent power is so potent, it should be exercised 'with restraint and discretion.''* Id at 1106. [Emphasis Added], (*quoting Chambers,* 501 U.S. at 50, 111 S. Ct. at 2132). In *Byrne,* counsel "filed a frivolous lawsuit, in bad faith, for the purpose of extorting a settlement," and, moreover, "abused the judicial process" by becoming a "willing participant in [his co-counsel's] continuing vendetta against the [defendants]." 261 F.3d at 1117. As such, we had no difficulty affirming sanctions against him as a valid exercise of the district court's inherent power, *Id.* at 1116, although we did reverse as to the sanctions entered against the plaintiff herself, *Id.* at 1117-27. The patently frivolous claims and extreme conduct involved in Byrne exemplify the sort of claims and conduct that ordinarily warrant sanctions against counsel. Title 28 U.S.C. § 1927.

**E.   Defendant, Lewis', Allegations that Christopher Peer was "not a Viable Candidate Seriously Intent About His Pursuit of the Office of Mayor of the City of Ft. Lauderdale" is Wholly Irrelevant to this Action**

This action was commenced by Peer against Lewis based upon paragraph 19 of Lewis' Emergency Complaint filed in State Court seeking to remove Peer as a mayoral candidate in 2006.  Defendant Lewis (as Plaintiff in the State Court case) stated in his pleading[10] that  "What is more, an October 15, 2005, credit report by TransUnion, one of the three major credit bureaus, reported that Defendant's current address is '18 Charter Drive, Wilmington, North Carolina 28403.'"

Aside from Lewis' statements in his Emergency Complaint, the question of whether Peer was a "viable candidate" is of no moment.  Peer properly qualified to run for the office of mayor.  There was nothing nefarious about that.  The fact that he received the least number of votes does not make his candidacy a fraud as suggested by Lewis.  Respectfully, the issue raised by Lewis is a non-issue in this case as to possible sanctions against Rosenbaum, not warranting the expenditure of judicial labor.

**F.   Peer Set Forth A *Bona Fide* Cause of Action**

Despite Defendant Lewis' protestations to the contrary, Peer properly alleged and can establish all of the elements of his claim and receive a $1000 statutory amount plus attorney's fees pursuant to Title 15 U.S.C. Section 1681 if the allegation in paragraph 19 of  Lewis' Emergency Complaint was true.  Peer

---

[10] Defendant Lewis makes much ado over the fact that his Emergency Complaint was not verified does not provide Lewis and his state counsel with the ability to make false statements in State court pleadings.  *See* Rule 1.030, Fla. R. Civ. P.

and Rosenbaum had no reason to doubt the veracity of the statement in paragraph 19.  As long as Peer could prove what Lewis admitted in his Emergency Complaint and to the media, his case was won.

Rosenbaum asserts that the case of *Northrop v. Hoffman of Simsbury*, 134 F.3d 41 (2nd Cir. 1997) is on point with the instant case.  In *Northrop* the Second Circuit Court of Appeals reversed and remanded an Order dismissing Plaintiff's complaint for failure to state a claim under the Fair Credit Reporting Act ("FCRA") 15 U.S.C. Section 1681 *et. seq*.  Unlike *Northrop*, no 12(b) Motion to Dismiss was filed by Defendant, Lewis.  Lewis simply answered and filed a countersuit.  If Defendant, Lewis believed Peer's FCRA claim was frivolous, he should have sought dismissal before answering.  Rosenbaum suspects that no Motion to Dismiss was filed as the same would have been frivolous, just as Lewis' Motion for Sanctions is.  Based upon Lewis' Emergency Complaint and Lewis' admissions to the media, a *prima facie* claim for a violation of the FCRA was properly alleged.

G.    **"Media Play" is Not an Issue**

Defendant Lewis claims that "media play" before the State court hearing and Primary was improper (D.E. pg. 12-14, para. 55-68).  At no point does Defendant Lewis distinguish any actual statements alleged to have been made by Rosenbaum as opposed to comments made by Charles Malkus or taken from public record.  Accordingly, Lewis has failed to establish that Rosenbaum's limited comments and acknowledgment that a FCRA suit had been filed fell outside the lines of the appropriate behavior.

Peer's political consultant, Malkus, specifically expressed his concerns about Lewis' potential to engage in identify theft with regards to Peer.  Via Defendant Lewis's allegations that the instant lawsuit was not properly investigated and was improperly pursued, Defendant Lewis seemingly seeks to insinuate that after the suit Rosenbaum asked a licensed private investigator authorized to serve federal court summons to serve Lewis quickly as some indication that Rosenbaum was engaged in bad faith or being a "bully."  Such was not the case.  Once a lawsuit is filed, Rosenbaum typically seeks that it be served quickly if deemed strategically or tactically advantageous.  Rosenbaum had discussed the suit with Malove, who refused to accept service and avoid what Lewis apparently claims was an abuse of process.  In any event, Rosenbaum was not a "bully" and did not act in bad faith by serving Lewis – via both substitute service (which could be contested)[11] – as well as personally.

### H.   Rosenbaum Knew That Peer's Credit Report Had Been Accessed Recently by <u>Comcast</u> and Knew the Plain Meaning of Paragraph 19 of the Emergency Complaint and Lewis' Subsequent Statements to the Media Refusing to Identify the Individual who Provided Him With Peer's Credit Report.

Rosenbaum knew that some evidence indicated that Lewis had not been the individual or company which directly accessed Peer's credit reports a few months earlier.  However, to say that the evidence (the credit report) warranted dismissal of the claim by Peer would be to wholly ignore the express language contained in paragraph 19 of Lewis' Emergency Complaint filed in state court

---

[11] Rosenbaum reasonably feared that Lewis would contest service based upon the fact that Peer initially prevailed in dismissing Lewis' Emergency Complaint based upon Peer's successful Motion Quash Service.

and, would require Peer and Rosenbaum to ignore the directly quoted statements of Lewis concerning his source of the information and his refusal to release his identity.

**I.     Lewis' Claim that Rosenbaum Had An "Improper Political Purposes" in Filing and Maintaining Peer's FCRA Action Is Incorrect.**

Defendant Lewis' claim that Rosenbaum had "improper political purposes" in filing and maintaining Peer's FCRA action is meritless and frivolous. Rosenbaum had nothing to do with anyone's mayoral campaign. All Rosenbaum did was agree to represent Peer – "the guy next door" on the campaign case on the theory that anyone who qualifies should be able to run. Rosenbaum and Peer entered into a Retainer Agreement in the Federal FCRA case and Rosenbaum issued monthly invoices for legal services rendered in connection therewith.

After reviewing paragraph 19 of Lewis' Emergency Complaint and hearing media reports that Peer's credit report had been obtained by a third party Lewis knew yet refused to identify, Rosenbaum believed those facts alone spoke volumes. Rosenbaum had no improper political purpose – he was merely serving a client who had a good faith basis to bring suit under the FCRA.

**J.     Rosenbaum's Rule 11 Notification Letter Was Not Baseless and Was Not an Improper Threat**

Rosenbaum's Rule 11 notification letter to Lewis as a *pro se* defendant was meritorious and was not an improper threat. Rather, it provided a correct statement of the law and the procedures surrounding Rule 11, F.R.Civ.P. The

letter only went to Lewis' baseless counterclaim where he again asserted some half-brained "conspiracy theory."[12]

Rosenbaum's Rule 11 letter and other correspondence with Defendant, Lewis as a *pro se* litigant, was entirely proper. Concededly, Rosenbaum did not follow up with a Rule 11 Motion following service of the notice. However, Rosenbaum could have filed his Rule 11 Motion at any time against Lewis. Subsequently, Lewis obtained O'Loughlin's services as counsel and a few days later Rosenbaum withdrew for Peer based upon medical reasons.

### K.   Lewis' Ex Parte Contact with the Magistrate Judge

After Lewis delivered correspondence directly to Magistrate Judge Snow on May 19, 2006, Rosenbaum did indeed write Lewis, a *pro se* defendant. Rosenbaum asked Lewis not to engage in direct *ex parte* contact with the assigned judge. Contrary to Lewis' Motion for Sanctions against Rosenbaum, while Southern District of Florida Local Rule 7.7 does apply to *pro se* litigants, *pro se* litigants do not have free access to *ex parte* opposing counsel. Rosenbaum informed Lewis of the same and advised that if Defendant Lewis continued to engage in *ex parte* communications with the judge on the case Peer would seek sanctions.

### L.   Rosenbaum Withdrew As Soon as Necessary

Rosenbaum withdrew on June 21, 2006 (DE 18). He was provided with a Motion for Sanctions predicated on the court's inherent power and Title 28 U.S.C. Section 1927 directly from Lewis on July 9, 2007. Rosenbaum admits that Lewis'

---

[12] From a review of the Docket, Lewis now seeks to amend his counterclaim in material respects.

argument that Rosenbaum withdrew before being served with a Rule 11 Motion is true, yet it is entirely misleading.  Rosenbaum did not withdraw in an effort to "dodge sanctions."  In actuality, based upon Rosenbaum's medical condition, he could not guarantee that he could proceed with discovery as was coming up in the upcoming months.  Peer wanted discovery to move forward.  Based upon "irreconcilable differences," which included Peer's inability to pay Rosenbaum's statement for legal services rendered, and Rosenbaum's inability to give prompt personal attention to the case, Rosenbaum withdrew as counsel.

### M.    Rosenbaum Did Not Abuse the Judicial Process for Improper Purposes

Despite Lewis' protestations that "…Rosenbaum should be sanctioned for maintaining this action for political purposes" (Memo at pg. 3), no evidence establishes Rosenbaum had any knowledge of or participation in an action for political purposes when filing Peer's *bona fide* claims as a result of violation of the FCRA.

Rosenbaum had nothing to do with the mayoral election other than being Peer's lawyer when Lewis sought to have Peer removed from the ballot and from public consideration in State court.  Rosenbaum had nothing to do with incidents Lewis swears occurred "on the campaign trail."  Rather, the scope of Rosenbaum's conduct only included actions in his role as attorney for Peer in the "campaign case."

**N.**     **Rosenbaum Did Not Engage in Bad Faith Delay and Obstruction Tactics**

Although Defendant Lewis's claims Rosenbaum engaged in "bad faith delay and obstruction tactics" (Memo at pg. 16) the same is, simply put: untrue.

Rosenbaum filed the instant case as soon as practicable.   Based upon emergency medical situations, Rosenbaum conducted little discovery — but contends that little was needed in light of the language contained in Lewis' Emergency Complaint and his statements to the media.

When Rosenbaum moved to withdraw, in an effort to protect Peer, Rosenbaum's lawyer requested 45 days for Peer to respond to discovery and retain counsel.  The request was granted in part.  The time for Peer to comply was shortened by the Court.

Rosenbaum did not delay this case in bad faith.  Rosenbaum was simply medically unable to proceed on behalf of his client, and timely withdrew based upon his health.

## CONCLUSION

Peer's suit was grounded in fact and supported by Defendant Lewis's own statement in his Emergency Complaint that:  **What is more, an October 15, 2005, credit report by TransUnion, one of the three major credit bureaus, reported that the Defendant's current address is '18 Charter Drive, Wilmington, North Carolina 28403.'"**

No proper basis has been made for Lewis' claim as to sanctions.  Lewis' repeated requests for sanctions should be denied as to Rosenbaum, who

initiated this Federal suit in good faith based upon facts contained in Lewis'
Emergency Complaint and his statements to the media.

**The apparent grounds for the sanction motion appears to be that Rosenbaum should not have believed Defendant's statements and by believing the Defendant the Defendant has the right to seek sanctions against Rosenbaum.** Accordingly, the Motion for Sanctions as to Richard L. Rosenbaum and the Law Offices of Richard L. Rosenbaum should be denied.

I hereby certify that on **October 15, 2007,** I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF and via U.S. Mail to Scott Greenbaum, Esq., Counsel for Plaintiff, 200 SE 18th Court, Ft. Laud., FL 33316 (who is not authorized to receive electronic filings.)

Respectfully submitted,

STEPHEN M. ZUKOFF, ESQ.
Counsel for Richard L. Rosenbaum,
individually and Law Offices of Richard
L. Rosenbaum
19 West Flagler Street, Suite 211
Miami, FL 33130
(305) 374-4331
Fla. Bar No: 0177061

ORIGINAL

**IN THE CIRCUIT COURT OF THE 17**
**JUDICIAL CIRCUIT, IN AND FOR**
**BROWARD COUNTY, FLORIDA**

DAN LEWIS,

      **Plaintiff,**

v.                                    **CASE NO.**      06000599

**CHRISTOPHER JAMES PEER,**

                      **Defendant.**/

## EMERGENCY COMPLAINT FOR DECLARATORY JUDGMENT
## CONCERNING CANDIDATE INELIGIBILITY

    1.      This is an action for declaratory judgment pursuant to § 86.011, Florida Statutes.

    2.      Plaintiff, Dan Lewis, is a resident, qualified elector and taxpayer in the City of Fort Lauderdale, Broward County, Florida,

    3.      The City of Fort Lauderdale (hereinafter "the City") is a home-rule municipality established under the Florida Statutes, with the right to establish rules governing the selection and qualifications of its elected officials through an adopted City Charter (hereinafter "the Charter").

    4.      To ensure the public good and protect the City's election process from political abuse, Article III, Section 3.03 of the Charter requires candidates to office to establish residency in the City of Fort Lauderdale at least "six (6) months immediately preceding the date of the election."

    5.      The Charter provides for a March general election in the event only two candidates qualify as candidates for a City elected office, or for the top two candidates who receive the most votes in a February primary election. Article VII, Section 7.06.

    6.      The Charter provides for a February primary election *only* in the event that



**EXHIBIT**
"A"

three or more candidates qualify for the election.  The charter also provides for the election of any candidate receiving more than fifty percent (50%) of the vote in a primary election. Article VII, Section 7.05.

7.     As applied to the pending March, 2006 municipal general election, a candidate that is elected must be a resident of the City not less than six (6) months immediately preceding the March election - or September 14th, 2005.

8.     The City Charter prescribes four (4) single-member city commission districts whereby only the voters who reside in each commission district may vote for commission candidates qualified to run in each particular district.  Article VII, Section 7.05.

9.     The City Charter provides for the mayor to be elected by all the voters of the city in a city wide election. Article VII, Section 7.05.

10.     Article III, Section 3.03 of the City Charter provides as follows:

**Sec. 3.03. Qualification of members; forfeiture of office.**

*To be eligible to hold the office of mayor-commissioner of the City of Fort Lauderdale, or to qualify for nomination or election as such, the candidate shall have resided in the City of Fort Lauderdale for six (6) months immediately preceding the date of the election,* shall continuously reside in the City of Fort Lauderdale, and shall be a resident of the State of Florida and a citizen of the United States of America; shall be duly qualified to vote at city, state and national elections; shall be over the age of twenty-one (21) years; shall be otherwise qualified as in this charter provided; shall hold no other public elective office; and shall not be an officer, employee or serving any capacity with the city government, except that a city commissioner serving may qualify for election to the office of mayor. Candidates for nomination or election as mayor-commissioner shall comply with all the rules and regulations set out in the charter as to their conduct. Any candidate for mayor-commissioner or any mayor-commissioner who shall cease to possess the qualifications required herein shall forthwith forfeit his office. To be eligible to hold the office of city commissioner of the City of Fort Lauderdale, or to qualify for nomination or election as such, the candidate shall have resided in the City of Fort Lauderdale for six (6) months immediately preceding the date of the election, and shall reside in the commission district from which he seeks election on the day he qualifies as a candidate for that office, shall continuously reside in that district and shall be a resident of the State of Florida, and a citizen of the United States of America; shall be duly qualified to vote at city, state and national elections; shall be over the age of twenty-one (21) years; and shall be otherwise qualified as in this

charter provided; shall hold no other public elective office; and shall not be an officer, employee or serving in any capacity with the city government, except that a city commissioner serving may qualify for reelection. Candidates for nomination or election for the office of city commissioner shall comply with all the rules and regulations set out in the charter as to their conduct. Any candidate for city commission or any city commissioner who shall cease to possess the qualifications required herein shall forthwith forfeit his office or candidacy. [Emphasis added]

(Ord. No. C-86-77, § 2, 9-16-86).

11.     Given the unequivocal mandate in the City Charter that "*the candidate shall have resided in the City of Fort Lauderdale for six (6) months immediately preceding the date of the election",* as stated in Article III, Section 3.03, Plaintiff has a *bona fide* doubt as to the rights of the parties, namely whether the Defendant has satisfied the Charter's residency requirement to become a legitimate candidate, and to serve, if elected.

12.     The City Charter apparently intends that if a candidate is to be elected in a primary election, then the "date of election" is presumed to the date of the Primary, or February 14th, 2006, in which case, the candidate must have "resided" in the City for the six (6) month period immediately preceding that date, that is August 14th 2005.

13.     Likewise, the City Charter apparently intends that if a candidate is to be elected in a general election, then the "date of election" is taken be the date of the general election, or March 14th, 2006. Thus, according to the Charter, the candidate must have "resided" in the City for the six (6) month period immediately preceding that date, that is September 14th 2005.

14.     If the term "resided," as used in Article III, Section 3.03, was intended by the Charter's Drafters to mean "domiciled" or "permanent" residency, as opposed to temporary, intermittent or sudden occupancy, then appropriate evidence of residency would include, for example, the filing of a homestead exemption, or the place of residency being accurately stated on one's drivers license, or the place of residency being accurately stated on the

voter's registration, or perhaps even a tax notice to an address within the City at a point in time preceding the required six (6) month minimum residency period.

15.    As of December 15, 2005, the Defendant's official voter's registration was in Ocala, Florida, which is well after the date required to establish residency for purposes of qualifying for election to City elected office.

16.    As of December 15, 2005, the Defendant's Florida driver's license listed an address in Ocala, Florida, which is well after the date required to establish residency for purposes of qualifying for election to City elected office.

17.    The Defendant has never voted as a resident of the City of Fort Lauderdale. He has voted using his Ocala residential address during the course of election years 2000, 2002 and 2004.

18.    A May 2004, the police report, which was prepared as a result of Defendant's arrest by the City of Fort Lauderdale Police, also indicates that his official residence is in Ocala, Florida.

19.    What is more, an October 15, 2005, credit report by TransUnion, one of the three major credit bureaus, reported that Defendant's current address is "18 Charter Drive, Wilmington, North Carolina 28403."

20.    As the fact set forth in the preceding paragraphs demonstrate, Plaintiff has a *bona fide doubt* as to the Defendant's lawful eligibility to run against and challenge the Plaintiff for the post of Mayor in the City of Fort Lauderdale due to the City Charter's unequivocal residency requirement and the apparent fact that Defendant will not have resided in the City of Fort Lauderdale for the six (6) month period immediately preceding the date of the upcoming March election, but rather resides in Ocala, Florida.

21.    The additional cost to the Taxpayers of the City if a primary election is

required, on the basis of Defendant apparent ineligibility, would exceed $96,850.00.

22.    Defendant has received notice of his apparent violation of the Fort Lauderdale City Charter by registering as a candidate for the office of City Mayor without satisfying the City Charter's residence requirement, yet has failed or refused to correct what appears to be a violation of the City Charter by withdrawing his candidacy or otherwise.

23.    Consequently there remains a *bona fide* doubt as to whether the Defendant satisfies the requirements of Article III, Section 3.03 of the City Charter.

24.    Plaintiff has *a bona fide* doubt as to the Defendant's eligibility to run for election to City Office and has an interest in being required to run solely against eligible candidates.

25.    Plaintiff and Defendant are in controversy as to whether Defendant meets the City Charter's minimum residence requirement to register as a legal candidate for this public office.

26.    In light of the notice given Defendant concerning his apparent violation of the City Charter, coupled with a failure or refusal to withdraw his candidacy, which in turn has triggered the requirement of costly primary election, Plaintiff respectfully requests a declaration of the parties' rights.

27.    Due to the City's necessity for administering a February 2006, primary election, as well as parties logistical necessity of, among other things, delivering absentee ballots, hiring poll workers and securing a primary physical campaign facilities – all in the next seven (7) to ten (10) days, Plaintiff further respectfully request an emergency hearing.

WHEREFORE, Plaintiff, DAN LEWIS, pray this Court grant his Motion for Emergency Hearing, and further an enter an Order declaring the Defendant's, CHRISTOPHER JAMES PEER's, candidacy for the post of Mayor-Commissioner of the City of Fort Lauderdale, unlawful, pursuant to the City Charter's qualification criteria for establishing residency, as prescribed in Article III, Section 3.03 of said City Charter, and for such other relief deemed just and proper.

Respectfully submitted,

**THE LAW OFFICE OF
ROBERT DAVID MALOVE, P.A.**
1 East Broward Boulevard, Suite 700
Ft. Lauderdale, Florida 33301
(954)745-5840

By: _____
Robert David Malove
Florida Bar No. 407283

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was delivered to the Clerk of the Circuit Court and to Christopher James Peer, 1420 Riverland Road, Ft. Lauderdale, Florida 33312, this 14th day of January, 2006.

By: _____
Robert David Malove

2-2-06 Sun Sentinel

# Hearing delayed on suit challenging mayoral run

## Primary election in Fort Lauderdale campaign hangs in the balance.

**BY BRITTANY WALLMAN**
STAFF WRITER

FORT LAUDERALE • Christopher Peer is still running for mayor, having deflected a legal challenge to his candidacy, at least for now.

Peer, a 35-year-old financial consultant, is defending his right to run for mayor against a lawsuit filed by opponent Dan Lewis. The two are challenging Mayor Jim Naugle in the scheduled Feb. 14 primary election.

Lewis' lawsuit contends Peer does not meet the city's six-month residency requirement because Peer was registered to vote under an Ocala address until January, and had his driver's license registered in Ocala as well.

If Lewis' lawsuit is successful, there will be no primary election and the contest will go straight to the March 14 general election ballot.

Broward Circuit Judge Miette Burnstein delayed the hearing on the lawsuit Wednesday because Peer had not been properly served with the lawsuit paperwork. Peer was present at the hearing.

The case will be heard after Peer is properly served, Burnstein said.

Peer argues he has lived in Fort Lauderdale for six years and just didn't get around until recently to transferring his voter registration and driver's license to Broward County.

Supporting Peer on Wednesday was local public relations consultant Chuck Malkus, who said he met Peer through Junior Achievement of South Florida. Malkus said he called in criminal defense attorney Richard Rosenbaum, who represented Lionel Tate.

Lewis says Naugle put Peer in the race to force a primary, adding that Naugle benefits by giving challengers less time to campaign. If a candidate gets more than half the primary votes, the mayoral election will be over and there will be no March 14 general election.

Naugle denied any connection to Peer.

"What's his proof?" Naugle asked, referring to Lewis. "He just goes around making these charges. . . . Is he also blaming me for Hurricane Wilma?"

Peer has not appeared at candidate forums and declined to say who talked him into running.

Until Wednesday, he said he didn't want to discuss his views on issues and had no platform. On Wednesday, Malkus pulled a typed statement from his suit pocket titled "Christopher Peer's Platform." It listed his top issues as public safety, hurricane preparedness, streetlight synchronization and beach erosion.

Rosenbaum and Malkus said they're pursuing a federal lawsuit against Lewis, claiming he broke the law by disclosing in his lawsuit information—an address—from Peer's credit report.

Lewis said he has never seen that credit report and was only told about it by someone he refused to identify.

*Brittany Wallman can be reached at bwallman@sun-sentinel.com or 954-356-4541.*

EXHIBIT "B"